

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00096-CV

_____

MICHAEL ANDERSON, Appellant

V.

THOMAS SNODDY, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 548-12

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss
.

## MEMORANDUM OPINION

Michael Anderson and Thomas Snoddy had a business relationship related to a bail bonding business in Gilmer, Texas, called Fast Action Bail Bonds. The relationship between Anderson and Snoddy and the roles and rights of each relative to the business were in dispute, but are not critical here. It is sufficient to say that Snoddy had been in the bail bonding business for many years and that Anderson was brought in to learn the business and run the local operation. After their falling out, Anderson sued Snoddy, complaining of misrepresentation, misappropriations, and malfeasance relative to the business. After a full trial on the merits, a jury determined that Snoddy should prevail on all of Anderson's claims. In accordance with the jury's verdict, the trial court entered judgment in favor of Snoddy.

On appeal, Anderson argues that the trial court erred in disallowing his attempts to impeach witnesses and in instructing the jury that such attempts constituted improper impeachment. He also argues that the trial court erred in excluding evidence, in limiting his cross-examination of Snoddy, and in admitting "impermissible character evidence." Anderson contends that the combined effect of the trial court's errors probably caused the rendition of an improper judgment.

We affirm the trial court's judgment because (1) denying use of unadmitted depositions in attempted impeachment was within the trial court's discretion, (2) excluding the judgments nisi was within the trial court's discretion, (3) limiting cross-examination of Snoddy was within the trial court's discretion, and (4) excluding character evidence was an issue not preserved for appeal.

*(1)     Denying Use of Unadmitted Depositions in Attempted Impeachment Was Within the Trial Court's Discretion*

Anderson argues that the trial court prevented him from introducing impeachment evidence from depositions taken in the case, limited his cross-examinations by continuously interrupting his efforts to impeach certain witnesses, and committed judicial misconduct by commenting on the weight of the evidence by its "interruptions, admonitions, and instructions." It is central to our analysis that Anderson never offered the depositions into evidence and that Anderson's attempted use of the depositions was to impeach witnesses.

In support of his arguments, Anderson points to a number of portions of the reporter's record, which we have categorized by the name of the witness on the stand. Anderson argues that the cumulative effect of the denial of the right to read from the depositions, the court's comments on his efforts to impeach witnesses in this way, and related errors in this case harmed him because the case "hing[ed] almost entirely on credibility."

The first example occurred with witness Harold Stein on the stand being questioned by Jonathan Wharton, counsel for appellant. Stein was a bail bond broker who worked for Surety Company, to which Snoddy paid thirty-five percent of Snoddy's share of revenues from the Gilmer business.

A.     [Stein]  Because we got -- Gerald Todd was qualified, Mr. Ken Goode sent paperwork to qualify Gerald Todd.

Q.     Have you ever told anyone about this before today?

A.     No one's ever asked me that question I don't believe.

Q.     Okay.  So this is basically a -- a -- I have never been directly asked whether Gerald Todd -- okay.

3

THE COURT: I mean, that -- wait. . . . if you're going to impeach the witness that's not proper impeachment. If you've got something in a deposition that's impeachable material, that's one thing, but that's improper.

[Anderson's Counsel]: Yes, Your Honor.

Q. [Anderson's Counsel] Okay. You've never -- you never told me about this in a deposition, right?

A. No, sir, I'm not sure you ever asked me . . .

THE COURT: Are you saying you asked it, Mr. Wharton, because like I said that's not proper impeachment.

[Anderson's Counsel]: I see what you're saying I guess, Your Honor.

Q. Okay. You -- you told me in your deposition that you don't know the structure of the Fast Action Bail Bond business in Upshur County, didn't you?

A. You know, I haven't read my deposition. I never got a chance to see that. I don't recall what I said to you.

Q. Okay. So if I asked you what's --

THE COURT: Let's do this the right way. . . . You got a page and a line. You identify that so [defense counsel] Mr. Van Cleef can also find it. You bring it up here and let the witness read it and then you ask the question.

[Anderson's Counsel]: Yes, ma'am.

THE COURT: Read it silently, the witness.

[Anderson's Counsel]: And may I --

THE COURT: You can approach.

[Anderson's Counsel]: May I start by asking the question though, the underlying question --

THE COURT: Sure. I think you did but if you didn't, go ahead.

4

Q. Okay. So do you know the structure of the Fast Action Bail Bond business in Upshur County?

THE COURT: Okay. Don't answer. I mean, I think you need to bring that up.

[Anderson's Counsel]: Okay. I'll bring it up. You've already - you've already said no to that or you already said yes, it's Gerald Todd or whatever.

THE COURT: Mr. Wharton, I don't think that's what he said.

Q. Okay.

The next Stein excerpt is:

Q. . . . And what did -- what did the, quote, unquote, Surety Company do in relation to these businesses in East Texas? There are more than one, right?

A. They provided people to put up financial statements to write bail bonds.

Q. Okay. So when I asked you in --

[Anderson's Counsel]: Let me approach, Your Honor.

THE COURT: Is this his deposition?

[Anderson's Counsel]: It is, Your Honor.

Q. And on page 14, line 23, I began, I say: The name of the company was Surety Company and your answer was yeah, yeah, it was just a company that had set up, Mr. Smith was involved and he had all throughout East Texas and Thomas somehow, I'm not sure how Thomas took over for Mr. Smith, but he took over for them where they were individual bail bondsmen and we would supply -- Where there were individual bail bondsmen and we would supply them clients or send them referral business and a Mr. Cathey --

[Snoddy's Counsel]: Your Honor, this is not -- I'm sorry, I don't want to miss an opportunity to object but because I don't know what we're doing. This is not a question.

5

THE COURT:   I'm not sure.

[Snoddy's Counsel]:   Improper impeachment.

THE COURT:   It's not proper impeachment.  So if you -- okay.

[Snoddy's Counsel]:   I object. This is improper impeachment.

THE COURT:   I'll sustain to that if that's what you're trying to do and I'm not sure what it is that you're claiming is [the disparity] between the deposition and the testimony today but you need to clarify that and then you need to show the witness a deposition and let him read the questions and the answers and then you can go into what you were doing if that's where you're going.

Q.      [Anderson's Counsel] Did you tell me anything about this or surety brokerage stuff at the deposition?

A.      I don't recall if you asked me.

Q.      When I asked you about the Surety Company, did you tell me?  Did you -- did you -- what did you -- when you -- what you told me was this -- was that you were a -- that you were bail bond broker and what Surety Company does is take the bail bond business and refer it to bondsmen.  Didn't say anything --

A.      That – that's one thing.  Absolutely.

Q.      Nothing, nothing about all this brokerage referral stuff, nothing like that.

A.      You never did ask me that . . .

Q.      Okay.  But when I asked you about Surety Company and what it does --

A.      I told you exactly what Surety Company did.  What you asked me, I answered your question directly.

Q.      You just -- I guess at that time didn't think that it was important to mention any of this other stuff.

. . . .

6

THE COURT: Again, this is -- why don't you let me see the deposition question because if you ask the witness that question that you're asking him now . . . that calls for a specific answer which he answered, you cannot impeach him from that now. I'm, you know, in the dark here because I don't have a deposition.

[Anderson's Counsel]: I can just, see, we can read the deposition at some point.

THE COURT: Well, I don't think so not unless it's proper impeachment. Let me see the deposition and the question and I'll read it silently.

[Snoddy's Counsel]: I have a copy. The Court can just hold onto this.

THE COURT: Just tell me, Mr. Wharton, just tell me what page and what line and I'll read the question.

[Anderson's Counsel]: Okay. . . . From 14 to 15, page 14 and 15. . . .

THE COURT: Okay. Mr. Wharton, which question is it you want me to focus on that you asked specifically where it would be what are all the duties or whatever all do you do and you don't have to -- I've got it so you can tell me what line.

[Anderson's Counsel]: Your Honor, in response --

THE COURT: Not in the response, I'm talking about what question was it that you asked him because that's what's important is the question that you asked him. So what question is it?

[Anderson's Counsel]: It was preceding a narrative, Your Honor. So it wasn't -- it wasn't in response to a direct question. He's talking about what the business does, what they do in relation -- we're asking about Fast Action Bail Bonds and the Surety Company and what they do and his response doesn't indicate anything about this referral.

THE COURT: Again I'm going to ask you one more time: What question, what is the question on line what that you asked him?

[Anderson's Counsel]: It's not a question, it's in the answer.

THE COURT: Okay. Well, that's not a proper impeachment.

[Anderson's Counsel]: Okay.[1]

Next we look at an excerpt from Anderson's counsel's similar attempt to impeach Barry Lovely, a bondsman who worked the Gilmer bail bond business after Anderson.

Q. [Anderson's Counsel] All right. Mr. Lovely, according to you, you don't know why Mr. Snoddy transferred you the phone number. . . .

A. [Lovely] The number was transferred because I was doing bonds.

Q. Did he ever . . . explain why he transferred the phone number to you?

A. To do bonds.

. . . .

THE COURT: What's the question?

[Anderson's Counsel]: The question was: Did he ever -- did Mr. Snoddy ever explain why he transferred the phone line to you?

THE COURT: Okay. And the answer on the deposition was?

[Anderson's Counsel]: Okay. So I'm allowed -- I can read it?

---

[1]After these discussions, Anderson's counsel began reading Stein's deposition, as shown by this excerpt:

Q. You're saying that you have all this -- that there's all this business relationship with your company in Upshur County or in Fast Action Bail Bonds, Upshur County. Page 16, line 24 I asked you, okay, so your only relationship, your only business dealing in Upshur County was to advertise some phone numbers in Upshur County, right. Your answer was, yes, sir. And I asked you, okay, and that's because you have a broker business where the phone numbers come in you can refer them to a bondman in Upshur County.

[Snoddy's Counsel]: Your Honor, this is not proper impeachment. He's just reading the deposition.

THE COURT: I'll sustain the objection.

THE COURT:   Yes. Yes, you can do that but you just have do the things leading up to it which you've done so you can do that.

Q.    [Anderson's Counsel] Okay. Okay.  Did he ever explain why he transferred that number to you.  And the answer was:   I never did say we had a conversation about it. We transferred it.  I said it's his number. He has the right to transfer it if he don't want to transfer it.

[Snoddy's Counsel]:   Your Honor, that is not the question that Mr. Wharton asked this witness. This is improper impeachment. He asked the witness if you ever have a conversation with him. He said no. That's not what this -- this doesn't say yes.

THE COURT:   I'll agree.  It doesn't so --

[Snoddy's Counsel]:   I would ask the jury --

THE COURT:    And -- okay. The jury will be instructed that that's not impeachment.

In response to counsel's questioning as to when Snoddy would transfer Fast Action's telephone line to him, Lovely testified, "If [Snoddy] transfers me the line on a Monday he'll call me [and] say I just transferred you the line," and Snoddy would also call him to let him know that "[he didn't] have a number [that] weekend or [day]."  Counsel attempted to impeach Snoddy with a portion of his deposition, prompting the trial court to conduct a bench conference in response to Snoddy's objection so the court could ask for an explanation as to why the deposition testimony was inconsistent with Lovely's trial testimony.  Anderson's counsel replied, "Because he says he doesn't know when it's transferred.  I mean, if he's -- if he's getting called when it's getting transferred, that's different than if he doesn't know."  The trial court stated, "It's got to be the same question," and concluded that Anderson's counsel was attempting an improper impeachment.  No jury instruction was given, and Anderson's counsel resumed questioning.

9

Anderson also attempted to impeach Snoddy with a similar tactic and received a similar reaction from the trial court. After Snoddy testified that he had not done business in Upshur County in the last couple of years, the following discussion ensued:

> Q. Okay. In -- when I asked you at your deposition, I asked you despite the fact you don't do any business in Upshur County.
>
> [Snoddy's Counsel]: Your Honor, that would be improper impeachment in the procedure if that's what we're doing here, appears to be what we're doing here.
>
> [Anderson's Counsel]: Your Honor, my understanding, I'm supposed to confront him with his statement before --
>
> [Snoddy's Counsel]: Well, you need to show it to him.
>
> THE COURT: Yeah, show him the -- show him the deposition, let him read it, and then if you asked a question that you're asking today that he answered differently then, then you go through it with him. But let him read it first. What line and page are you on?
>
> . . . .
>
> Witness: What's your question?
>
> Q. [Anderson's Counsel] The question is: You said, now, today you're saying that your businesses have been doing bail bond business in Upshur County. You've been doing business in Upshur County.
>
> THE COURT: Well . . . I think the witness testified that . . . he hadn't done business in Upshur County in the last couple of years so I'm not sure what your question is.
>
> [Anderson's Counsel]: He said had not? Maybe I misheard him. Did he say he had or had not?
>
> THE COURT: I thought he said he had not in the last couple of years.
>
> [Snoddy's Counsel]: That's what he said.

10

THE COURT: I'm sorry, Mr. Snoddy.

Witness: That was what I said.

[Anderson's Counsel]: Okay. Well, I just misheard him then. I apologize.

THE COURT: Okay.

[Snoddy's Counsel]: Your Honor, since that is an impeachment procedure I would ask the Court to let the jury know that that was not an impeachment.

THE COURT: Obviously the jury -- obviously that was not an impeachment, it was a misunderstanding or mischaracterization or misunderstanding of the witness's answer and just disregard that whole . . . series of questions.

Anderson again tried to impeach Snoddy:

Q. According to you these incidents with Barry Lovely in which he's impersonating Michael Anderson are a setup by Michael Anderson.

A. I don't know if I called the situation with Barry child games or a setup . . .

Q. Let me do this right and show you and let you read your deposition here. . . . This is page 45, line 5 and we're going to go down here to 14 --

A. (Resuming) Okay. That's what I just -- that's what I just said.

Q. [By Mr. Wharton] You said you didn't call child's games, you said you didn't say -- use the word setup.

A. I said the child games came with the calls to my office.

Q. Okay. So but you -- you said that --

[Snoddy's Counsel]: Pardon me, Your Honor. Once again that was an impeachment procedure and there was no impeachment. . . .

11

After a bench conference, the trial court permitted Snoddy's counsel to take Snoddy on voir dire so that he could read portions of the deposition under the rule of optional completeness.

Next, Stein testified, "I know [Snoddy's] checks were made out to Surety Company." When Anderson's counsel was trying to question Snoddy about the bank account from which he wrote checks to the surety, the following ensued:

> Q.      . . . . You told me or you indicated on direct that I had information for your bank accounts for this case, for the -- for your bank from which you claim you sent money to the surety, right?
>
> A.      I think I gave you the -- my bank's name. . . .
>
> Q.      Okay.  . . . I'm going to give you a copy of all your discovery responses . . . Can you show me where in here you listed the account from which you sent money to the surety . . .
>
> THE COURT:   Why don't you short circuit this and show the question where you ask that so that he can look and it won't take so much time.
>
> [Anderson's Counsel]:  Okay.  Well, Your Honor, I didn't -- I never asked -- I mean –
>
> THE COURT:   You didn't ask the question?
>
> [Anderson's Counsel[:   Well, I asked --
>
> [Snoddy's Counsel]:  I object.  That is improper impeachment, Your Honor.
>
> THE COURT:   Exactly.  If you ask a question for that -- for the discovery of that information, point that out and let him look at the answers.
>
> [Anderson's Counsel]:  Okay.
>
> THE COURT:   If you didn't this is improper.
>
> [Anderson's Counsel]:  Okay.

THE COURT: So I don't know because I don't have the stuff in front of me.

[Anderson's Counsel]: All right.

Q. [Anderson's Counsel] Mr. Snoddy, I asked you for the copies of your checks at the bank, right?

A. Yes.

Q. Okay. And you told me you didn't have it.

A. Right.

THE COURT: And this has been asked and answered.

[Anderson's Counsel]: Okay.

Q. So the only time that you've mentioned a bank, the name of the bank and the contact information for a bank is when I asked you about this $5,000 loan stuff, right? You claimed that you had gotten a loan so I said state the name, address, and phone number for any loan bank which gave you a loan for or on behalf of the plaintiff and that's when you said Citizens National Bank.

A. That's my bank.

Q. Okay. It doesn't -- it doesn't say this is the bank from which I sent money to the surety, right?

THE COURT: That wasn't asked, Mr. Wharton.

[Anderson's Counsel]: That's what -- that's what I'm asking him.

[Snoddy's Counsel]: Well, that would be --

THE COURT: Well, that is improper. How many times am I going to have to tell you, if you ask the proper question and he doesn't answer it truthfully or he answers it differently than he's [answered] before, that's impeachment. You have to ask the question. You have to ask it in your discovery and then him fail to answer it or answer it in a way differently than he testifies. I don't know how to make it any clearer, but we're not going to do this anymore, okay.

[Anderson's Counsel]: And may we approach, Your Honor?

(Bench conference)

[Anderson's Counsel]: I'm trying do my best. I -- I m --

THE COURT: You don't ask the question. You can't impeach him. You did not ask the question. Did you said ask -- you said you didn't because you didn't show it to him.

[Anderson's Counsel]: If -- if -- so if he said on direct that he told me the name of the bank from which and he's basically saying you can get the records, you could have gotten the records, I'd like to contradict that by showing that he didn't tell me that.

[Snoddy's Counsel]: You have to have asked it though.

[Anderson's Counsel]: But if you put in the in the evidence, how can I contradict that?

THE COURT: I think the question -- I'd have to look -- we'd have to get the court reporter to look, but the question was something like he could have gone to your bank and gotten those records. But, you know, you have to ask the question to get the bank information so you can't get back in there because of that question that Mr. Van Cleef asked. So anyway let's move along.

[Anderson's Counsel]: Okay.

(End of bench conference)

At the outset of our analysis, we agree with Anderson that the deposition excerpts were admissible and could have been admitted into evidence. Under Rule 801 of the Texas Rules of Evidence, in a civil case, a statement made in a deposition taken in the same proceeding is not hearsay, and the deponent's unavailability as a witness is not a requirement for admissibility.[2]

---

[2]The Texas Rules of Evidence were amended by orders of the Texas Supreme Court and the Texas Court of Criminal Appeals, effective April 1, 2015. The Texas Rules of Evidence cited in this opinion are the Rules in effect at the time when this case was tried in October 2014. To facilitate access to the text of the October 2014 version of the Rules,

TEX. R. EVID. 801(e) (3), 60 Tex. B.J. 1129, 1141 (1997). Anderson points out that opposing counsel never lodged a hearsay objection to the depositions, but he misses a critical step— Anderson never offered the depositions into evidence. Thus, he was attempting to read from and reference documents that were never offered as exhibits.

Yet, there is no requirement that a deposition be admitted into evidence before it can be used for impeachment purposes.

> (a) Examining Witness Concerning Prior Inconsistent Statement. In examining a witness concerning a prior inconsistent statement made by the witness, whether oral or written, and before further cross-examination concerning, or extrinsic evidence of such statement may be allowed, the witness must be told the contents of such statement and the time and place and the person to whom it was made, and must be afforded an opportunity to explain or deny such statement. If written, the writing need not be shown to the witness at that time, but on request the same shall be shown to opposing counsel. If the witness unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted. This provision does not apply to admissions of a party-opponent as defined in Rule 801(e) (2).

> (b) Examining Witness Concerning Bias or Interest. In impeaching a witness by proof of circumstances or statements showing bias or interest on the part of such witness, and before further cross-examination concerning, or extrinsic evidence of, such bias or interest may be allowed, the circumstances supporting such claim or the details of such statement, including the contents and where, when and to whom made, must be made known to the witness, and the witness must be given an opportunity to explain or to deny such circumstances or statement. If written, the writing need not be shown to the witness at that time, but on request the same shall be shown to opposing counsel. If the witness unequivocally admits such bias or interest, extrinsic evidence of same shall not be admitted. A party shall be permitted to present evidence rebutting any evidence impeaching one of said party's witnesses on grounds of bias or interest.

---

each citation to the Texas Rules of Evidence will be followed by a citation to the volume and page of the Texas Bar Journal in which the October 2014 version of the cited Rules first appeared.

TEX. R. EVID. 613(a) (1)–(3), Tex. B.J. 1129, 1145–146 (1997). Anderson argues that the foundational requirements in Rule 613 are simple and that he was not required to show the witness the prior statement before inquiring about it as the trial court required.

Trial courts "shall exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." TEX. R. EVID. 611(a); *see Stam v. Mack*, 984 S.W.2d 747, 752 (Tex. App.—Texarkana 1999, no pet.). Accordingly, "[t]he trial court has great discretion over the conduct of a trial." *Watson v. Telecheck Servs.*, *Inc.*, No. 06-08-00018-CV, 2008 WL 3850671, at *3 (Tex. App.—Texarkana Aug. 20, 2008, no pet.) (mem. op.); *see Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

As for the first excerpt related to Stein, it appears the trial court interrupted the examination because counsel failed to inform Stein of the content, time, and place of the statement. As for the remaining excerpts, the trial court was generally addressing Snoddy's objections that Anderson was attempting to conduct an improper impeachment. Although it is not the common practice, Anderson has cited us to nothing that, in the face of an objection by opposing counsel, prevents a trial court from exercising its discretion to require counsel to demonstrate that a prior statement not in evidence is inconsistent with the statement made by the witness at trial before its use.[3] *See*

---

[3]Because the depositions are not in the appellate record, we do not address the trial court's decisions on whether the prior statements were inconsistent.

16

*Allstar Nat'l Ins. Agency v. Johnson*, No. 01-09-00322-CV, 2010 WL 2991058, at *3 (Tex. App.—

Houston [1st Dist.] July 29, 2010, no pet.) (mem. op.).

The trial court was within its discretion in limiting the above examples of Anderson's

attempted impeachment.[4]

---

[4]In a related argument, Anderson asserts on appeal that the trial court's comments and instructions regarding improper impeachment constituted impermissible comments on the weight of the evidence that were "intended as a direct influence on the jury's analysis of credibility," and suggested that "the plaintiff's attorney was out of line in impugning the witnesses' credibility." A "judge should refrain . . . from making any comments aimed at the weight of the evidence, whether the comments be direct or indirect." *McNatt v. J.D. Hopkins Grp. LLC*, No. 14-11-00649-CV, 2012 WL 3133871, at *3 (Tex. App.—Houston [14th Dist.] Aug. 2, 2012, no pet.) (mem. op.); *see Metzger v. Sebek*, 892 S.W.2d 20, 38 (Tex. App.—Houston [1st Dist.] 1994, writ denied). "During trial, the judge should not make unnecessary comments or remarks that may result in prejudice to a litigant." *Metzger*, 892 S.W.2d at 38. Further, "[a] trial judge should be fair and impartial and not act as an advocate for any party, nor should the judge be any party's adversary." *Allstar Nat. Ins. Agency*, 2010 WL 2991058, at *2. Anderson complains that the trial judge violated these principles in this case, and that he suffered prejudice as a result. In essence, he is alleging that this case presents a question of judicial misconduct. *See McNatt*, 2012 WL 3133871, at *3.

An "objection to a trial court's alleged improper conduct or comment must be made when it occurs if a party is to preserve error for appellate review, unless the conduct or comment cannot be rendered harmless by proper instruction." *Francis*, 46 S.W.3d at 241 (citing *State v. Wilemon*, 393 S.W.2d 81 (1965)); *Martin v. Parris*, No. 06-10-00037-CV, 2011 WL 766653, at *5 (Tex. App.—Texarkana Mar. 4, 2011, no pet.) (mem. op.); *In re M.E.C.*, 66 S.W.3d 449, 458 (Tex. App.—Waco 2001, no pet.) ("Generally, a complaint that a trial judge has made improper comments must be properly preserved for appellate review."). Anderson bears the burden to "'explain how any comments made by the trial judge were incurable or would excuse' the 'failure to preserve error.'" *Martin*, 2011 WL 766653, at *5 (quoting *Francis*, 46 S.W.3d at 241).

In this case, we find that Anderson has failed to preserve error. Anderson did not inform the trial judge of his belief that the judge's comments were improper and did not ask that the court make its rulings on these matters outside of the jury's hearing. Anderson also did not ask the judge to inform the jury that its rulings with regard to impeachment were not comments on either the weight of the evidence or the witnesses' credibility.

Moreover, in exercising its broad discretion under Rule 611, a "trial court has the authority to express itself." *Francis*, 46 S.W.3d at 240–41 (citing *Bott v. Bott*, 962 S.W.2d 626, 631 (Tex. App.—Houston [14th Dist.] 1997, no writ)). "Thus, to reverse on such claims, we must find both judicial impropriety, and probable prejudice to the complaining party." *McNatt*, 2012 WL 3133871, at *3; *Allstar Nat'l Ins. Agency*, 2010 WL 2991058, at *2 (citing *Bott*, 962 S.W.2d at 631; *Pitt v. Bradford Farms*, 843 S.W.2d 705, 706–07 (Tex. App.—Corpus Christi 1992, no writ)); *see* TEX. R. APP. P. 44.1(a) (stating that appellant must demonstrate that error probably caused rendition of an improper judgment)).

A trial court's statement during the course of trial impermissibly comments on the weight of the evidence if "it indicates the judge's opinion concerning a matter to be determined by the jury." *M.E.C.*, 66 S.W.3d at 458 (quoting *Knoll v. Neblett*, 966 S.W.2d 622, 640 (Tex. App.—Houston [14th Dist.] 1998, pet. denied)). Here, the court's comments did not address the issues that would be submitted to the jury and did not reflect the court's opinion on the credibility of the witnesses. The comments merely clarified, correctly, that counsel had failed to impeach the witness.

Additionally, "procedural explanations . . . [are] within the discretion vested in the trial court during the conduct of a trial." *Martin*, 2011 WL 766653, at *6. "'[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality

17

*(2)    Excluding the Judgments Nisi Was within the Trial Court's Discretion*

"Proceedings for the forfeiture of bail formally commence with the entry of a judgment nisi, by which the court acquires jurisdiction to adjudicate the matter of enforcing the bond obligation." *Int'l Fid. Ins. Co. v. State*, 71 S.W.3d 894, 896 (Tex. App.—Texarkana 2002, no pet.) (citing *Burgemeister v. Anderson*, 259 S.W. 1078, 1078–79 (Tex. 1924)). "A judgment nisi is an interlocutory, conditional judgment . . . . [which] declares that a bond is forfeited unless the defendant shows good cause for his failure to appear in the court . . . ." *Id.* (citing TEX. CODE CRIM. PROC. ANN. art. 22.02 (West 1989); *Jackson v. State*, 422 S.W.2d 448 (Tex. Crim. App. 1968)).

Anderson offered three judgments nisi into evidence. While all of these judgments nisi sought to recover money from the clients, as the principals, the first listed "MICHAEL ANDERSON DBA FAST ACTION BAIL BONDS" as the surety. The written contract for this bond demonstrated that the surety was Fast Action and that Anderson had signed the oath of sureties on behalf of Fast Action. The second and third judgments nisi listed only Fast Action as the surety. When Anderson offered these judgments nisi, he represented that they were "judgments against Mr. Anderson individually for the Fast Action Bail Bonds forfeitures."

---

challenge.'" *Id*. (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). "'A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.'" *Id*. (quoting *Liteky*, 510 U.S. at 556); *see Francis*, 46 S.W.3d at 240–41.

When Snoddy objected on the ground that these exhibits were not relevant,[5] Anderson responded:

> As far as relevance goes, Your Honor, fairly straightforward, these judgments show the business and specifically Michael Anderson has done forfeitures and surety has -- he has been named personally and he has as Mr. Snoddy testified, he paid those. So the surety didn't step in and pay those. Obviously very relevant to whether or not there's actually a surety.

Snoddy then argued that the judgments nisi were not relevant for the purpose proposed by Anderson because they simply commenced bail forfeiture proceedings, were not actual judgments against Anderson or Fast Action, and did not constitute evidence that any money had been paid on bond forfeitures. The trial court agreed and sustained Snoddy's objection.

Anderson argues that the trial court erred in excluding the judgments nisi. A trial court's ruling on the exclusion of evidence is reviewed for abuse of discretion. *Manasco v. Ins. Co. of State of Pa.*, 89 S.W.3d 239, 241 (Tex. App.—Texarkana 2002, no pet.); *Baker v. Gregg Cnty.*, 33 S.W.3d 72, 77 (Tex. App.—Texarkana 2000, pet. dism'd); *Austin v. Kerr–McGee Ref. Corp.*, 25 S.W.3d 280, 287 (Tex. App.—Texarkana 2000, no pet.). "To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to guiding rules or principles; in other words, we determine whether the act was arbitrary or unreasonable." *Manasco*, 89 S.W.3d at 241.

Anderson contends that the judgments nisi were relevant because Stein testified that they determined who is liable on the bond forfeiture and because, according to Anderson, they "proved

---

[5]Snoddy also objected that the exhibits had not been disclosed to him in violation of the trial court's pretrial scheduling order. However, the trial court explained, "They're supposed to be exchanged and marked, but that's just for the purposes of my benefit."

that there was no surety standing behind Fast Action." The judgments nisi were conditional in nature and did nothing to demonstrate whether the sureties would be obligated to pay any judgment that Fast Action could not satisfy. Because the second and third judgments nisi made no mention of Anderson's name, the trial court could have determined that they had no tendency to support the proposition that Anderson would be personally liable on a future judgment. Likewise, the trial court noted that the forfeiture proceeding initiated by the first judgment nisi was dismissed; thus, the court could have concluded that that judgment served no purpose. Accordingly, we conclude that Anderson has failed to show that the trial court abused its discretion in excluding the judgments nisi. We overrule this point of error.

*(3)      Limiting Cross-Examination of Snoddy Was Within the Trial Court's Discretion*

During Snoddy's cross-examination, the following discussion ensued:

> Q.      So if you . . . contribute property to a partnership do you . . . believe that you retain ownership of it, that it's still yours even though you terminated the partnership?
>
> [Snoddy's Counsel]:   Objection, Your Honor. This calls for a legal conclusion.
>
> THE COURT:   Sustained.
>
> [Anderson's Counsel]:   Okay. I'll provide Your Honor with what I've marked or what I listed 24. This is Section 152.102 of the Property Code entitled Classification Partnership Property.
>
> [Snoddy's Counsel]:   Your Honor, if that's going to happen --
>
> THE COURT:   First of all, I'm not sure you're going to tender a statute to me.
>
> [Anderson's Counsel]:   For judicial notice that this is the law.

20

THE COURT: Okay. Well, I understand the law, but you can't ask the witness to testify as a legal expert.

[Anderson's Counsel]: Okay.

THE COURT: I'm sustaining. The objection I sustained, not to my own understanding. . . .

Q. [Anderson's Counsel] All right. So let me -- let me pose a hypothetical to you based on this law. So property is partnership property if acquired in the name of one or more partners regardless of whether the name of the partnership is indicated if the instrument transferring title to the property --

[Snoddy's Counsel]: Your Honor, I object. This is not a question. He is reading the law to a witness who is not qualified to --

THE COURT: Sustained, and I'll instruct the jury on the law when it's time.
. . . .

Q. Okay. Do you know the -- have you gone over all the rules for determining if a partnership is created?

A. Yes.

Q. Okay. So you're aware of the factors would include receipt or right to receive a share of the profit of the business, expression of an intent to be partners in the business, participation or right to participate in control of the business.

[Snoddy's Counsel]: Your Honor, this would be a multi-part question or he's just reading the law again and I object.

THE COURT: Sustained.

Anderson argues that the trial court erred in prohibiting his cross-examination because the questions call for Snoddy's understanding of the law, not unsupported legal conclusions.

"The trial court has broad discretion about the extent of cross-examination allowed." *Harris Cnty. v. Inter Nos*, *Ltd*., 199 S.W.3d 363, 368 (Tex. App.—Houston [1st Dist.] 2006, no

21

pet.) (citing *Tex. Employers' Ins. Ass'n v. Garza*, 557 S.W.2d 843, 845 (Tex. App.—Corpus Christi 1977, writ ref'd n.r.e.)); *see* TEX. R. EVID. 611(a); *Brooks v. Armco, Inc.*, 194 S.W.3d 661, 665 (Tex. App.—Texarkana 2006, pet. denied). "The conduct and extent of cross-examination is entrusted to the sound discretion of the trial court, and its ruling will not be disturbed unless it is arbitrarily and unreasonably made." *Ferrara v. Moore*, 318 S.W.3d 487, 497 (Tex. App.—Texarkana 2010, pet. denied).

A lay witness is not allowed to make legal conclusions or interpret the law. *Schronk v. City of Burleson*, 387 S.W.3d 692, 705 (Tex. App.—Waco 2009, pet. denied). Also, because a legal conclusion offered by a lay witness does not establish that legal conclusion, the trial court could have determined that Snoddy's understanding of the law was irrelevant to the jury's determination of whether a partnership existed. *See Hoss v. Alardin*, 338 S.W.3d 635, 644 (Tex. App.—Dallas 2011, no pet.). Anderson has not shown that the trial court abused its discretion in its ruling on this matter. This point of error is overruled.

*(4)     Excluding Character Evidence Was an Issue Not Preserved for Appeal*

Anderson objected to Snoddy's cross-examination of Stein as follows:

> Q.     Is it your impression that Mr. Lovely has -- does underhanded business practices?
>
> [Anderson's Counsel]:   Objection, Your Honor. You don't get to testify in character like that, unless he's a character witness.
>
> [Snoddy's Counsel]:   Pardon me, Your Honor, he said he's known him twenty years in the business --
>
> THE COURT:   I'll overrule the objection.
>
> [Snoddy's Counsel]:   I'm sorry?

22

THE COURT:   I overruled the objection.

[Snoddy's Counsel]:   Go ahead, Mr. Stein.

A.     (Resuming) I don't know of any underhanded.

Q.     [Snoddy's Counsel] In the roughly nineteen years you've known him that's not been an issue for you?

A.     Not for me it has not.

On appeal, Anderson argues that the evidence was inadmissible under Rules 404(a) and 405(a) (1) of the Texas Rules of Evidence.[6]   As a prerequisite to presenting a complaint for appellate review, Anderson was required to state his objection with "sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." *See* TEX. R. APP. P. 33.1(a) (1) (A).  Anderson did not raise Rule 404 or 405 issues at trial and did

---

[6]The relevant portions of those Rules read:

Rule 404.  Character Evidence; Crimes or Other Acts

(a)   Character Evidence Generally. Evidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

> (1) Character of accused. Evidence of a pertinent character trait offered: . . .

>     (B) by a party accused in a civil case of conduct involving moral turpitude, or by the accusing party to rebut the same;

Rule 405.  Methods of Proving Character

(a)     Reputation or Opinion. In all cases in which evidence of a person's character or character trait is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion.  . . . In all cases where testimony is admitted under this rule, on cross-examination inquiry is allowable into relevant specific instances of conduct.

TEX. R. EVID. 404(a), 405(a), Tex. B.J. 1129, 1134 (1997).

not suggest that the question called for improper character evidence.  Rather, he argued that Stein could not offer character evidence because he was not somehow properly designated or otherwise qualified as a character witness.  An objection at trial that does not comport with a point of error on appeal preserves nothing for review.  *See* TEX. R. APP. P. 33.1(a); *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999).  Accordingly, we overrule this point of error.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     July 29, 2015
Date Decided:       September 25, 2015